UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.N.,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>KILOLO KIJAKAZI,<br><br>　　　　　Defendant. | Case No. 21-cv-08427-EMC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Docket Nos. 11-12 |

Plaintiff M.N. seeks review of the Commissioner's final decision denying her applications for disability insurance benefits and supplemental security income. M.N. has exhausted her administrative remedies with respect to her claim of disability. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). M.N. seeks an order reversing the agency decision and remanding for payment of benefits or, in the alternative, remand for further administrative proceedings. Defendant Kilolo Kijakazi, in her capacity as Commissioner of the Social Security Administration ("SSA"), opposes the motion and cross-moves for summary judgment.

Having considered the parties' briefs and the administrative record, the Court hereby **DENIES** M.N.'s motion and **GRANTS** the SSA's.

**I.　　FACTUAL AND PROCEDURAL BACKGROUND**

On May 14, 2019, M.N. filed both a Title II application for disability insurance benefits and a Title XVI application for supplemental security income, alleging disability beginning October 18, 2018. *See* AR 214-215. M.N. alleged disability due to adhesive capsulitis, depression, anxiety with panic attacks, and insomnia.

M.N.'s claims were initially denied on August 1, 2019, and upon reconsideration on

1   December 18, 2019.  *See* AR 139, 148.  Ms. Navarro then filed a request for a hearing before an

2   administrative law judge ("ALJ").  *See* AR 154.  On December 10, 2020, ALJ Cabotaje held a

3   telephonic hearing.  *See* AR 35 *et seq.* (hearing transcript).

4         During the hearing, M.N. testified that she suffers from both physical and mental

5   impairments.  With respect to her mental impairments (which are the sole focus of the summary

6   judgment papers), she stated that she has social anxiety and that interactions with people trigger

7   her anxiety as well as panic attacks.  *See* AR 44-45, 48 (hearing transcript).  M.N. stopped

8   working because of these mental impairments (as well a problem she was having with her right

9   shoulder and arm) and because her mother had a medical emergency in Venezuela and M.N.

10  needed to go see her.  *See* AR 44-45.

11        In her testimony, M.N. also indicated that, when interactions are relatively brief in nature,

12  she is able to function.  Thus, for example, when she has flown on a plane (as she did to visit her

13  mother in Venezuela), she has been able to navigate the airport because, even though she has to

14  have contact with airport/airline employees (ticketing, customs, etc.), the encounters are short.  *See*

15  AR 48-49.  On the plane itself, she can take a tranquilizer or sleep.  *See* AR 47.

16        As another example, M.N. admitted that, during the alleged period of disability, she lived

17  in a women's shelter, *i.e.*, with other people.  However, she would avoid social interactions.  She

18  was able to avoid other residents in part because there were no social areas.  While she could

19  encounter other tenants in the bathroom, the encounters were brief and she would not engage in

20  conversation.  *See* AR 50.

21        Finally, M.N. testified that, during the alleged period of disability, she attended the City

22  College in San Francisco.  *See* AR 51.  She noted, however, that her classes were entirely online,

23  she did not have to do presentations, and she communicated with her professors primarily by

24  email (though she did have some meetings with professors by Zoom).  *See* AR 52, 55.  She

25  received A's in her courses.  *See* AR 53.

26        The ALJ employed the five-step sequential process to determine whether M.N. was

27  disabled.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Under that process, if an ALJ finds

28  that the claimant is disabled at a given step, then the ALJ need not proceed to the next step.  *See*

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). If the ALJ cannot determine whether the claimant is disabled, the ALJ will continue to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At step one, the ALJ considered whether M.N. was engaged in substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). He found that M.N. had not engaged in substantial gainful activity since the alleged disability onset date. *See* AR 18 (ALJ decision).

Regarding step two, the ALJ evaluated whether M.N. suffered from a "severe medically determinable physical or mental impairment, or combination of impairments" for a continuous period of at least 12 months. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *see also* 20 C.F.R. §§ 404.1509, 416.909. The ALJ determined that M.N. suffered from the following severe impairments: "adhesive capsulitis of the right shoulder, and a mental impairment variously diagnosed to include major depressive disorder, social anxiety disorder, and agoraphobia with panic disorder." AR 19 (ALJ Decision).

With respect to step three, if an impairment or combination of impairments meets or is equal to one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 in both duration and severity, then the ALJ must find the claimant to be disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The ALJ concluded that M.N.'s impairments did not meet or equal a listed impairment. With respect to M.N.'s mental impairments, the ALJ also assessed her symptoms according to the "paragraph B" and "paragraph C" criteria but found they were not satisfied. *See* AR 19-21.

At step four, the ALJ determined whether M.N.'s residual functional capacity allowed her to perform her past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). With respect to M.N.'s physical residual functional capacity, the ALJ found that she had the ability to perform medium work with few limitations (not relevant here). With respect to M.N.'s mental residual functional capacity, the ALJ concluded that M.N. could have only "occasional contact with coworkers and supervisors, no shared tasks with coworkers, and only brief tangential contact with the public." AR 21. Based on the physical and mental residual functional capacity assessed, the ALJ found that M.N. was not able to perform any past relevant work, which was consistent with the testimony of a vocational expert attended the ALJ's oral hearing and testified that M.N.

1 would not be able to perform her past work. *See* AR 26; *see also* AR 62 (hearing transcript).

2 Finally, at step five, the ALJ considered whether, give M.N.'s age, education, work

3 experience, and residual functional capacity, there were jobs that existed in significant numbers in

4 the national economy that she could perform. *See* 20 C.F.R. §§ 404.1520(a)(4)(v),

5 416.920(a)(4)(v). The ALJ agreed with the vocational expert's testimony that there were such

6 jobs, such as a hand packer or stores laborer. *See* AR 27; *see also* AR 62-3 (hearing transcript).

7 Accordingly, the ALJ found that M.N. was not disabled.

8 The ALJ's decision in which he found M.N. not disabled issued on January 14, 2021. The

9 Appeals Council subsequently denied her request for review. *See* AR 2 (notice of Appeals

10 Council action).

## II.     DISCUSSION

A. Legal Standard

After a final decision on a claim for benefits has issued, the claimant may seek judicial review of that decision by a district court. *See* 42 U.S.C. § 405(g). The Commissioner's decision will be disturbed only if the ALJ has committed legal error or if the ALJ's findings are not supported by substantial evidence. *See Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006). Substantial evidence is relevant evidence – "more than a scintilla, but less than a preponderance" – that a reasonable mind may accept to support a conclusion. *Lingenfelter v. Astrue*, 504 F.3d. 1028, 1035 (9th Cir. 2007). A court evaluates "the record as a whole, . . . weighing both the evidence that supports and detracts from the ALJ's conclusion" to determine if substantial evidence supports a finding. *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001). If the evidence supports "more than one rational interpretation," the Court must uphold the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005).

B. Credibility of Claimant

In his decision finding M.N. not disabled, the ALJ made the following assessment regarding M.N.'s credibility: "[M.N.'s] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the

4

1    medical evidence and other evidence in the record." AR 21.  In short, the ALJ found M.N. only

2    partially credible.  M.N. contends that the ALJ erred in so finding.

3           An ALJ must provide clear and convincing reasons for rejecting a claimant's credibility

4    and must support these reasons with substantial evidence.  *See Smolen v. Chater*, 80 F.3d 1273,

5    1284 (9th Cir. 1996).  As indicated above, "[s]ubstantial evidence means such relevant evidence as

6    a reasonable mind might accept as adequate to support a conclusion."  *Molina v. Astrue*, 674 F.3d

7    1104, 1110 (9th Cir. 2012) (internal quotation marks omitted), *superseded on other grounds as*

8    *stated in Fay B. v. Saul*, No. 20-cv-05173-JSW, 2022 U.S. Dist. LEXIS 50102, at *11 (N.D. Cal.

9    Mar. 21, 2022).  The Court concludes that the ALJ met this required standard.

10          There is no dispute that M.N.'s mental impairments caused her to have panic attacks and

11   anxiety, as well as other symptoms.  There is also no dispute that the panic attacks, anxiety, and

12   other symptoms are triggered primarily when M.N. has social interactions with others and/or has

13   to perform in front of others.  This is precisely what M.N. testified to at the oral hearing before the

14   ALJ; it is also what she expressly states in her motion.  *See* Mot. at 14 (stating that M.N.

15   "repeatedly noted that her anxiety and panic attacks were triggered by social interactions and the

16   need to perform in front of people").  But notably, the ALJ credited all of this – *i.e.*, he recognized

17   that M.N. experienced panic attacks and anxiety resulting from having to interact with others

18   and/or having to perform in front of them.  And based on this recognition, the ALJ found that

19   M.N. had significant restrictions on her mental functional capacity: she could only have

20   "occasional contact with supervisors and coworkers; . . . no shared tasks with coworkers; and . . .

21   brief, tangential contact with the general public."[1]  AR 21 (ALJ decision).

22          Implicitly, the ALJ only found M.N. not credible to the extent she claimed that the

23   symptoms resulting from her mental impairments were *completely* debilitating.  In this regard,

24   though reasonable minds might disagree, there was still sufficient evidence for the ALJ to find

25   M.N. not credible.  First, there was evidence suggesting that M.N. was able to cope with some

---

[1] It appears that "occasional" has been defined only with respect to exertional limitations.  *See, e.g.*, SSR 96-9p (in discussing sedentary work, stating that "'[o]ccasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday").

5

stressors in her life, including from having interactions with others. For example, as the ALJ noted in his decision, *see* AR 22 (ALJ decision), in 2020, M.N. was living in a women's shelter and had to deal with other residents, including a roommate. Although she reported to a treating doctor that she initially struggled with having a roommate (*e.g.*, believing that the roommate stole from her) and avoided her, the relationship improved over time. M.N. also dealt better with other residents living in the shelter over time. *See, e.g.*, AR 762 (Dr. Fisher medical records, dated 8/5/20 and 9/2/20) (taking note of "[i]mproved relat w room[m]ate, who is making less noise"; also stating that "[d]ealing better w room mate and other residents living at the Shelter").

        The ALJ also fairly took note of M.N.'s ability to cope with stress related to the COVID-19 pandemic. *See* AR 22 (ALJ decision). In her brief, M.N. notes that, because of the shelter-in-place requirement, she did not have to work and did not have to interact with others (except for those in the women's shelter). *See* Mot. at 14. That does not mean, however, that the pandemic was not still a source of stress and that she was able to cope with that stress to some extent. *Compare, e.g.*, AR 826-27, 829 (Smith medical records, dated 2/26/2020, 3/11/2020, and 3/18/2020) (noting that M.N. "reported increase in anxiety and depression related to: new global Coronavirus," "[p]rocessed fears around Coronavirus," and "processed continued anxieties/overwhelm with COVID-19 shelter-in-place"), *with* AR 825 (Smith medical record, dated 6/4/2020) (noting that "[c]lient reported feeling confident overall in her ability to manage stressors related to COVID-19," though also noting that other matters were causing her to feel depressed).

        The Court acknowledges that the examples above do not in and of themselves show that M.N. was able to work – *i.e.*, being able to cope with anxiety resulting from living with others or from the COVID-19 pandemic does not clearly translate to being able to function in a work setting. Nevertheless, they still weigh against M.N.'s claim of a "totally debilitating impairment." *Molina*, 674 F.3d at 1113 (stating that "[e]ven where [everyday] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment").

        Second, not only was there evidence that M.N. was able to cope (to a degree) with some

6

stressors in her life, but there was also evidence indicating that M.N. was not completely debilitated so long as social interactions and/or the need to perform in front of others could be circumscribed. For example, M.N. was able to take online classes on a part-time basis at City College in San Francisco, to grocery shop unattended, and take an international flight on an airplane. M.N. contends that the Court should not give much weight to these examples because the social interactions were very limited in nature – *e.g.*, for college, she typically communicated with professors through email, and she was given accommodations such as not being required to do presentations; also, for her flight on the plane, she took a tranquilizer. However, M.N. did participate in some Zoom meetings with professors, *see* AR 51-2 (Oral Hearing), and, even if she did not have to engage with anyone on the actual flight, she still had to deal with airport/airline employees in order to get through the airport and board the plane in the first place.

M.N. protests still that the ALJ misconstrued the record and found her not credible because he focused on evidence of improvement without taking into account that, given the nature of her mental impairment, she sometimes has good days and sometimes has bad days. But the ALJ did, in fact, recognize that M.N. could have "fluctuations in symptoms, particularly when dealing with situational stressors." AR 22 (ALJ decision). The ALJ placed limitations on her mental functional capacity as a result – *i.e.*, only occasional contact with supervisors/coworkers, no shared tasks with coworkers, and only brief contact with the public in order "to accommodate fluctuations in [her] symptoms and to minimize the added stressors caused by social interactions." AR 26.

Accordingly, the Court finds no error in the ALJ's credibility finding.

C.  <u>Medical Opinions</u>

M.N. challenges next the findings made by the ALJ with respect to several medical sources. According to M.N., the ALJ improperly credited the opinions of Dr. Chandler, an examining physician, as well as those of Drs. McClain and Colsky, both nonexamining consulting physicians. M.N. further asserts that the ALJ improperly rejected the opinions of Dr. Fisher and Ms. Smith (a L.M.F.T.), both of whom were treating medical sources. The Court does not agree. The ALJ properly addressed the supportability and consistency of each opinion, and, when

rejecting an opinion, supported his decisions with substantial evidence.

For Title II and Title XVI claims filed after March 27, 2017, the ALJ is required to assess the persuasiveness of the medical opinion using the regulations outlined in 20 C.F.R. §§ 404.1520c and 416.920c. Under these new regulations, the ALJ is asked to consider five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other facts including but not limited to a medical source's familiarity with the other evidence in the claim or an understanding of the disability program's policies and evidentiary requirements. *See* 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). Of these five, the ALJ must address supportability and consistency in each assessment and may, but is not required to, explain how it considered the remaining three factors. *See* 20 C.F.R. §§ 404.1520c(a)(2), 416.920c(a)(2). "Supportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.'" *Woods v. Kijakazi*, 32 F.4th 785, 791-92 (9th Cir. 2022); *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) (stating that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be"). "Consistency means the extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.'" *Woods*, 32 F.4th at 792 (9th Cir. 2022); *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) (stating that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be").

The new regulations eschew the former hierarchy of medical opinions and no longer require the ALJ to afford greater weight to the opinions of treating physicians. *See Woods*, 32 F.4th at 787; *see also* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (providing that "[w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources"). Instead, an ALJ is free to consider each medical opinion equally and may find an opinion more persuasive

8

than others provided that substantial evidence supports such a finding. When rejecting a medical opinion as unsupported or inconsistent, the ALJ is required to provide an explanation supported by substantial evidence. *See Woods*, 32 F.4th at 792. If the ALJ does so, then a court may not overturn the ALJ's decision "unless it is . . . based upon legal error." *Luther v. Berryhill*, 891 F.3d 872, 875 (9th Cir. 2018).

        1.      <u>Drs. Chandler, McClain, and Colsky</u>

As indicated above, Drs. Chandler, McClain, and Colsky were not treating physicians. Dr. Chandler, a psychologist, was an examining physician. She was appointed by the Department of Social Services to conduct an independent consultative evaluation regarding M.N.'s mental impairment. As for Drs. McClain and Colsky (respectively, a psychologist and psychiatrist), they were nonexamining, consulting physicians. They were also appointed by the Department of Social Services but simply reviewed the medical record to assess the severity of M.N.'s symptoms. Because Drs. McClain and Colsky did not actually examine M.N., the Court focuses first on Dr. Chandler's evaluation.

Dr. Chandler diagnosed M.N. with having a social anxiety disorder with panic attacks and an unspecified depressive disorder. Regarding cognitive functioning and work-related abilities, Dr. Chandler noted that M.N. was "able to interact appropriately" with her and had only mild difficulty in enduring the stress of the interview and in maintaining attention and concentration. Dr. Chandler concluded that, "[b]ased upon observations of current behavior and reported psychiatric history and in less structured settings, [M.N.'s] ability to interact with the public, supervisors, and coworkers appears to be mildly to moderately impaired." AR 528 (Dr. Chandler report). There is substantial evidence to support Dr. Chandler's medical assessment. Dr. Chandler's assessment was based on a clinical interview and mental status examination of M.N. (which included questioning and behavioral observations). Although M.N. fairly points out that Dr. Chandler saw her on only one day, which was not necessarily representative of her condition – particularly given the fluctuations in her symptoms – Dr. Chandler fairly pointed out that the examination itself was a source of some stress but that M.N. was able to cope with such stress with only mild difficulty. Moreover, Dr. Chandler recognized that M.N. did have limitations

related to her inability to interact with others. The ALJ credited those limitations in concluding that M.N. had the mental residual functional capacity to only have limited interactions, including with supervisors and coworkers.

There is also substantial evidence of consistency between Dr. Chandler's assessment and other evidence in the record. For example, Dr. McClain, one of the nonexamining, consulting physicians who conducted a review of the medical record, provided a similar evaluation with respect to M.N.'s functional limitations. According to Dr. McClain, M.N. had moderate limitations in (1) the ability to interact appropriately with the general public, (2) the ability to accept instruction and respond appropriately to criticism from supervisors, and (3) the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes – but that M.N. would be able "to engage in occasional direct interaction with [the] public, supervisors, and co-workers." AR 80-81. Dr. Colsky, another nonexamining, consulting physician, also reached the same conclusions with respect to functional limitations.[2] *See* AR 116-17 (Dr. Colsky report).

The Court also notes that Dr. Painter and Dr. Fisher, two of M.N.'s treating physicians, made comments similar to those made by Dr. Chandler with respect to M.N.'s medical condition. Dr. Painter, like Dr. Chandler, recognized that M.N. had difficulties with relationships. *See, e.g.*, AR 456, 465, 470 (Dr. Painter medical records); *see also* AR 469 (taking note of symptoms identified by M.N. – *e.g.*, mistrust, fear others talking about her, avoiding social engagements, etc.). Dr. Fisher noted the same. *See, e.g.*, AR 850 (Dr. Fisher letter) (stating that M.N. "is often suspicious of others" and "has difficulty interacting with others and self-isolates"). As for functional limitations, Dr. Painter did state that M.N.'s "depressive symptoms have impaired her

---

[2] In her papers, M.N. criticizes Drs. McClain and Colsky for reporting that M.N. "ha[d] never attended therapy with a mental health professional." AR 77, 113 (reports of Drs. McClain and Colsky). The record does indicate that M.N. was treated by mental health professionals, including Dr. Painter (beginning on 8/30/2018), *see* AR 443; Ms. Smith (beginning on 7/10/2019); and Dr. Fisher (beginning on 7/17/2019), *see* AR 541. However, the record also indicates that Drs. McClain and Colsky made this statement in recounting the report of Dr. Chandler. In her report, dated 7/9/2019, Dr. Chandler noted *as part of the mental health history reported to her* that "[t]he claimant has never attended therapy with a mental health professional." AR 527 (Dr. Chandler report). As of 7/9/2019, M.N. had not seen either Ms. Smith or Dr. Fisher. It had been about a year since she had seen Dr. Painter.

10

ability to work at her full capacity," AR 425, and Dr. Fisher opined that "[e]veryday social interactions cause irrational anxiety, fear, and self-consciousness." AR 850. However, these comments are not inconsistent with Dr. Chandler's assessment to the extent that Dr. Painter and Dr. Fisher did not give any clear opinion on the extent that M.N. was impaired as a result of her mental condition. Furthermore, the evidence of record does not indicate that either Dr. Painter or Dr. Fisher found M.N.'s mental condition completely debilitating, particularly if stressors could be reduced. *See* AR 26 (ALJ decision) (noting "significant difficulties with social interactions, as evidenced by notations of the claimant's depressed/anxious mood" and imposing "significant social limitations" as a result; expressly stating that social limitations were assessed "to accommodate fluctuations in the claimant's symptoms and to minimize the added stressors caused by social interactions").

To be sure, there is some inconsistency between Dr. Chandler's assessment and that of Ms. Smith, who was one of M.N.'s nonmedical treating sources. However, as discussed below, Ms. Smith's treatment notes do not support her assessment.

2.  Dr. Fisher and Ms. Smith

With respect to Dr. Fisher and Ms. Smith, M.N. contends that the ALJ did not properly credit their opinions. But as indicated above, Dr. Fisher's opinions are consistent with the evidence described above. *See also* AR 850 (Dr. Fisher diagnosing M.N. with "Major Depressive Disorder, recurrent, moderate"). As for Ms. Smith, she opined, *e.g.*, that M.N. would not "be able to maintain the emotional regulation and focus to carry out even simple instructions over the period of an 8-hour day" due to the severity of her symptoms. AR 847. She also found that M.N.'s symptoms worsened due to the stress of her last job, and that M.N. could not maintain stable employment due to her mental condition. *See* AR 847. However, although Ms. Smith opined that M.N. did not have the ability to work, Ms. Smith's treatment notes indicate otherwise (as the ALJ noted in his decision).

For example, for the period July 2019 through September 2020, Ms. Smith's medical records largely reflect improvement. *See* AR 599-610 (Ms. Smith medical records, 7/10/2019 to 9/18/2019); AR 811-16 (Ms. Smith medical records) (9/25/2019-9/28/2020). *See, e.g.*, AR 828

11

(Ms. Smith medical record, dated 3/4/2020) (noting that M.N. "[r]eported an increase in self-esteem and independence," completion of "difficult assignments for schools" and "successful[] communicat[ion] with new roommates"); AR 823 (Ms. Smith medical record, dated 6/16/2020) (stating that M.N. "reported continued progress and improved mood" and "decreased anxiety due to stable housing and lack of work-related stressors"; adding that M.N. "processed feeling ready to move to biweekly due to progress"); AR 820 (Ms. Smith medical record, dated 7/20/2020) (noting that M.N. "reported feeling motivated, empowered"); AR 819 (Ms. Smith medical record, dated 8/17/2020) (noting M.N. "has engaged in online dating"); AR 816 (Ms. Smith medical record, dated 9/28/2020) (stating that M.N. "identified motivation to advocate for her/other tenants' needs in current program"). It was only beginning in October 2020 that Ms. Smith began to assess M.N. as being "worse." *See, e.g.*, AR 815 (Ms. Smith medical record, dated 10/15/2020) (assessing M.N. as "Worse"). And even then, Ms. Smith took note at one point that, while M.N. "shared/clarified having daily fleeting thoughts of suicide, wishing she never would wake up, [she was] managing them okay with her medication, attempts at enga[g]ing in self-care, activities." AR 813.

Moreover, Ms. Smith notably stated in a letter supporting M.N. that M.N.'s "depression and anxiety make it difficult for her to function and perform job duties consistently, *specifically when she has to interact or respond to others*, reporting her anxiety becomes unbearable." AR 847 (Ms. Smith letter, dated 11/29/2020) (emphasis added). This ultimately was a limitation that other medical sources identified and that the ALJ recognized and gave credit to in the mental residual functional capacity he assigned to M.N. There also does not appear to be any evidence in the record that Ms. Smith believed M.N.'s mental condition would be completely debilitating even if the stressors that typically gave rise to her panic attacks and anxiety could be reduced. In other words, Ms. Smith did not address whether M.N. could work provided if certain social triggers were removed and did not comment on whether those stressors could be reduced.

The Court therefore finds that substantial evidence supports the ALJ's assessment of the medical evidence, both with respect to the nontreating physicians and the treating physicians.

### D. Third-Party Testimony

Finally, M.N. argues that the ALJ erred because she provided lay testimony in support of her claim for disability and the ALJ failed to provide germane reasons for discrediting that testimony. *See Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) (stating that "lay testimony . . . is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so"). In response, the SSA suggests that the standard in *Lewis* is no longer applicable because the regulations were amended in 2017 and now state that the agency is "not required to articulate how we considered evidence from nonmedical sources using the requirements in paragraphs (a) through (c) in this section." 20 C.F.R. §§ 404.1520c(d), 416.920c(d).

For purposes of this decision, the Court need not decide whether the SSA's new regulations are valid and applicable, because, even if the *Lewis* standard still governs, the ALJ did not reject the lay testimony that M.N. asked him to consider. *See M.P. v. Kijakazi*, No. 21-CV-03632-SVK, 2022 WL 1288986, at *7 (N.D. Cal. Apr. 29, 2022) ("The 2017 regulations adjusted requirements for an ALJs' consideration of nonmedical evidence, and the Ninth Circuit has not yet addressed whether the 'germane reasons' requirement for discounting lay witness testimony survives the enactment of the new regulations."); *see also Thomas v. Comm'r of Soc. Sec. Admin.*, No. CV-20-01787-PHX-MTL, 2022 WL 292547, at *7 (D. Ariz. Feb. 1, 2022) ("The Ninth Circuit has not yet addressed the meaning of this provision or whether the germane reasons rule survives its enactment, and district courts in this Circuit have split on the issue."). The lay witnesses who provided statements in support of M.N. were Ms. Fick (a former supervisor) and Mr. Evans (a former co-worker). Both worked with M.N. at The Center for Independent Living where M.N. served as a work incentives disability benefits counselor – "counseling part time for individuals with mental health disabilities," which "required her to travel around Alameda County to meet with clients." AR 363 (Fick letter). In her letter, Ms. Fick noted that M.N. was "required to go out into the field and meet with clients" but "it was soon observed that her anxieties made it difficult for her to meet with clients or prepare and provide the presentations required in her position." AR 363. Ms. Fick also stated that M.N. "did not seem well when interacting with

13

staff." AR 363. In his letter, Mr. Evans provided a similar assessment, stating that M.N. had "a very difficult time handling the demands of serving clients, who themselves have mental health disabilities, and was frequently unreliable and resistant to meeting with these clients both in our office and out in the community." AR 361 (Evans letter).

In his decision, the ALJ expressly took note of both of the letters submitted by Ms. Fick and Mr. Evans. *See* AR 22 (ALJ decision). But contrary to what M.N. suggests (or even – surprisingly – the SSA), nowhere did the ALJ expressly or implicitly reject their statements; rather, if anything, he credited their statements by imposing significant restrictions on the interactions that M.N. could have with others – whether supervisors, coworkers, or the public. The ALJ imposed the limitations that M.N. can have "occasional contact with coworkers and supervisors (and no shared tasks with coworkers), and only brief, tangential contact with the public." AR 23. Nothing about the letters from Ms. Fick and Mr. Evans suggested that M.N. could not work under the restrictions imposed by the ALJ. The nature of the work M.N. did for the CIL requiring significant contact with others is not work for which the ALJ found M.N. eligible.

### III.     CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ did not commit clear error and his findings are supported by substantial evidence. Accordingly, the Court denies M.N.'s motion for summary judgment and grants the SSA's.

This order disposes of Docket Nos. 11 and 12. The Clerk of the Court is instructed to enter a final judgment in accordance with the above and close the file in the case.

**IT IS SO ORDERED**.

Dated: July 28, 2022

_____
EDWARD M. CHEN
United States District Judge